## Gray v. Commonwealth.

March 23, 1943.

834

A. B. Thomason, Milton Quinton, Jr., David Weil and George Woolcott for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER —Affirming.

Appellant was found guilty of the murder of Byrd Taulbee and sentenced to die in the electric chair. We are asked to reverse the judgment because (1) alleged error of the court in overruling a demurrer to the indictment; (2) alleged mental condition; (3) alleged coercion used in procuring the confession introduced in evidence; (4) alleged error of the court in admitting incompetent evidence; and (5) because of his youth.

The uncontradicted facts are: On the afternoon of January 31, 1942, appellant, William Gray, accompanied by Archie Simpson, who was jointly indicted with him, and a boy named Taylor, all of whom are young negroes, attended a show at the opera house in Lexington, at which time they drank some wine which was furnished by Taylor. They left the show about 5:30 p. m. and proceeded to Carver's Tavern where they continued drinking. Gray and Simpson, after buying additional wine, departed for the latter's home located at 603 Marino Street in the vicinity of the Southern Railroad. Taylor remained at the tavern and did not participate in the events hereinafter related. Appellant and his companion remained at Simpson's home until about 8:15 p. m. While there, Joseph Childs called and was invited by Simpson to "go out" with him and Gray that night.

Childs asked them what they were going to do and he was told that they were "going to knock old man Taulbee in the head when he closed up, and rob him." Childs refused to join them. Mr. Taulbee was an elderly white man who ran a store on Marino Street close to the home of Simpson. Gray and Simpson went to the Taulbee store wherein Gray first entered. He ordered a nickel's worth of minced ham and engaged the storekeeper in conversation. While Taulbee's attention thus was diverted, Simpson entered the store and, going behind the counter, stole 150 pennies from a box. Gray was the first to leave the store, but was followed closely by Simpson. They divided the loot and agreed to lie in wait for Mr. Taulbee and rob him as he passed under an overpass of the railroad which it was necessary for him to do to reach his automobile parked nearby. They waited there about an hour and a half. In the meantime Gray possessed himself of a Pepsi-Cola bottle which he carried for the admitted purpose of striking Mr. Taulbee on the head. Simpson secreted himself in the shadows under the bridge while Gray remained in sight of anyone who might approach. Mr. Taulbee closed the store and proceeded along the road towards his car. As he passed Simpson, he was tackled by the latter and thrown to the ground. While Simpson held him Gray struck him on the side of the head with the Pepsi-Cola bottle which broke with the first blow. In the scuffle a pocket was torn from Simpson's coat and was later found at the scene of the crime. Gray found a large paving brick lying nearby and with it as a weapon continued the assault, resulting in injuries to the victim which caused his death a few hours thereafter. Before departing, the conspirators robbed their victim of a bunch of keys and approximately $4 in money. They then proceeded to Simpson's home. Having no use for the keys Simpson placed them in a lighted stove, in the ashes of which they were later recovered by the police. They remained at the house about five minutes, then proceeded to a gambling house which was being operated by Tom Vernon in the east end of Lexington. There they engaged in a crap game and lost all the money they had secured in the robbery, except a small amount they spent for a quart of wine. They remained at Vernon's place until about 12:15 a. m. on the following morning. Gray then went to his residence where he was arrested later that day. The officers began questioning

Gray about 1:30 p. m. and at 5:33 he signed a confession from which we have taken the above statement of facts.

Separate trials were had on the joint indictment. Simpson too was convicted and sentenced to death, the judgment in which case was affirmed in an opinion this day rendered styled Archie Simpson v. Commonwealth of Kentucky and cited in 293 Ky. 831, 170 S. W. (2d) 869.

The complaint concerning the indictment is frivolous, and is based on the fallacious contention that an indictment for murder must recite that the instrument causing the death of the victim was not only deadly in itself but is one susceptible of producing death in the manner in which it was employed at the time of the commission of the crime. If counsel for appellant are serious in this contention, they have been misled by the opinions of this court in respect to the requirements of an indictment for the offense of wounding with a deadly weapon denounced by KRS 435.170(2) (Section 1166, Carroll's Kentucky Statutes). That section of the Statutes provides that any person shall be confined in the penitentiary for not less than two nor more than twenty-one years who shall strike with intent to kill another with a deadly weapon, if the person bruised does not die from the wound. In such character of case, as was held in Lyon v. Commonwealth, 194 Ky. 570, 239 S. W. 1046, where the instrument alleged to have been used is less formidable and deadly than the ordinary tool with which homicide is generally produced, it is necessary that the indictment aver that the instrument used by the defendant was a deadly weapon when employed by him in the way and manner set forth in the indictment. The reason for the rule is that, since one cannot be guilty of the crime of wounding with intent to kill unless the instrument used can produce death in the manner in which it is employed, the indictment must show that fact in a description of the crime. But the allegation in an indictment that murder has been committed shows of itself that the instrument employed by the defendant not only was capable of producing death, but actually did so. The further allegation that the instrument as employed by the defendant in the commission of the crime was capable of producing death would be superfluous and would be no less without reason than a requirement that the word murder in an indictment should be followed by the words

"to death." This distinction is pointed out in Landrum v. Commonwealth, 266 Ky. 655, 99 S. W. (2d) 787 and cases therein cited.

We pass to the second complaint. Each of several lay witnesses testified that in his or her opinion, the defendant was of unsound mind and incapable of comprehending the statements contained in the written confession and that he or she was of the opinion appellant was incapable of knowing right from wrong. The facts related in support of these opinions are not sufficient upon which to base the conclusions arrived at by the witnesses. A school teacher testified that he was very slow to learn and that he was retained in the second grade for two years and could not complete the course of study prescribed for the third year of school. The owner of the house in which appellant lived testified that he collected rent from appellant almost every Sunday for the two years preceding the commission of the crime and on those occasions appellant seemed to be very ignorant and to be of unsound mind because his answers to questions by the landlord invariably were the same, viz., "I don't know." All the testimony concerning the facts relied upon as a basis for the conclusion that appellant is of unsound mind merely shows that he is slow to learn and not of average intelligence; but that is far short of showing that he was incapable of knowing what he was doing at the time he committed the crime or that he was incapable of distinguishing between right and wrong. In any event, the court properly submitted the question of insanity to the jury and we are of the opinion the jury rightly decided that this defense had not been established.

It is argued that, at the time appellant signed the written confession he was under coercion of police officers, particularly Mr. Maupin. Appellant relies solely on his own testimony to support this contention. In chambers, out of the hearing of the jury, he testified that Mr. Maupin picked up a pair of scissors from a desk and told him that unless he signed the confession he would "jab it in my insides." On cross-examination he admitted that before this alleged act transpired he had made a free, voluntary, and true confession of what occurred before, during, and immediately following the crime; that the written statement contained a true and accurate account of these events and was a true and ac-

curate record of his confession of the crime as stated verbally by him in the presence of the officers; that he was told before he made any statement in respect to the case that they wanted him to make a statement for the purpose of using it upon his trial as evidence for the Commonwealth; that he did not have to make any statement about it at all and any statement he made would have to be made voluntarily and freely with the knowledge on his part that it could and would be used against him upon the trial. He stated that he clearly understood the officer and that he freely and voluntarily confessed and that it was only after his free and voluntary confession that the scissors were picked up by Mr. Maupin. He then affirmed the verity of all of the statements contained in the confession. Thus, his own testimony on the motion shows clearly and distinctly that no coercion was used to obtain the confession. Conceding for the sake of argument that Maupin conducted himself in the manner related by appellant, no coercion was shown in procuring the confession; there was, at most, coercion in obtaining the signature to the written recitation thereof.

In their brief, counsel do not point to the admission of any incompetent evidence; nevertheless, we have reviewed all of the testimony to determine for ourselves if any error occurred in this respect. There was some evidence erroneously introduced by the Commonwealth concerning statements made by Simpson without showing that they were made in the presence of Gray; however, they were statements of facts related by appellant in his confession, and therefore were not prejudicial to his substantial rights. Even had they been, appellant interposed no objection to the questions, nor did he ask to have the answers excluded from the consideration of the jury. Under those circumstances, we would not be privileged to reverse the judgment.

Lastly, while appellant's youth appeals to our sympathy, we know of no rule of law which would permit us to reverse the judgment on that account. He had arrived at the age which gives the court jurisdiction of his person, and the law prescribes no lesser penalty for the perpetrator of a crime at the age of 17 than it does for one who has attained his majority. The crime was willfully committed; had been planned for hours in advance; the manner agreed upon for its commission specifically

called for striking the victim over the head with a bottle; when the bottle was rendered useless by breakage, a heavy brick was employed; death was produced; murder had been committed. It is the peculiar province of the jury within legal limits to fix the penalty which they believe the evidence demands. We have carefully perused the record and find no error prejudicial to appellant's substantial rights.

Wherefore, the judgment is affirmed.